## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BALMORAL RACING CLUB, INC.,            )
MAYWOOD PARK TROTTING CLUB             )
ASSOCIATION, INC., and THE             )
ILLINOIS HARNESS HORSEMEN'S            )
ASSOCIATION, INC.,                     )
                                       )
            Plaintiffs,                )
                                       )
     v.                                )   No. 11 C 1028
                                       )
CHURCHILL DOWNS, INC., CHURCHILL       )
DOWNS TECH. INITIATIVES CO. d/b/a      )
TWINSPIRES.COM and YOUBET.COM, LLC,    )
                                       )
            Defendants.                )

### MEMORANDUM OPINION

Before the court is Balmoral Racing Club, Inc.'s ("Balmoral") and Maywood Park Trotting Club Association, Inc.'s ("Maywood") motion for a preliminary injunction. For the reasons explained below, we deny their motion.

### BACKGROUND

Balmoral and Maywood, which operate horse-racing tracks in Illinois, entered into a Co-Branding Agreement (the "CBA") with Youbet.com, Inc. ("Youbet") in December 2007. (Stipulated Statement of Facts ¶¶ 4, 15 (hereinafter, "Stip. Facts"); see also CBA, attached as Ex. A to Pls.' Mot.) Pursuant to the agreement Youbet agreed to develop a "co-branded version" of its advance-

deposit-wagering ("ADW") service. (CBA § 1.)[1] As originally conceived, the co-branded version of Youbet's service (called the "Co-Branded Pages" in the CBA) would have its own URL — www.youbetillinois.com. (Id. at § 2.2.) The co-branded website would look and function just like www.youbet.com, the company's "standard offering of the Service." (Id. at § 1.) But the logos of the "Associates," the CBA's term for the racetrack operators, would appear on the website. (Id.) Youbet agreed to use "reasonable efforts" to "transfer" its existing Illinois customers (numbering approximately 10,000, according to the defendants) to the Co-Branded Pages. (Id. at § 4.2; see also Blackwell Decl. ¶ 13.) In addition, the parties agreed to jointly market the Co-Branded Pages to develop new customers for the service. (CBA §§ 2.1, 2.2.) The parties would then share the "Net Commissions" and "Net Revenues," as those terms are defined in the CBA, generated by wagers placed through the Co-Branded pages. (Id. at § 6.)

The parties' actual performance deviated somewhat from the CBA's express terms. Youbet did not create a separate co-branded website. Instead, all wagers placed by customers with a verified Illinois address on www.youbet.com were used to calculate the parties' fees. (Stip. Facts ¶ 43.) Youbet provided all ADW-

---

[1] ADW is "a form of pari-mutuel wagering on the outcome of horse races in which an individual may establish an account with a licensed entity, deposit money into the account, and use the account balance to pay for pari-mutuel wagers placed via internet or telephone." (Stip. Facts ¶ 1.)

related services, which included: collecting and storing customer account information, operating the websites, providing customer support, and processing wagers. (Id. at ¶¶ 44-50.) Illinois-based Youbet customers agreed to be bound by Youbet's terms and conditions and were subject to Youbet's privacy policy. (Id. at ¶¶ 51-52.) Balmoral and Maywood, for their part, spent a substantial amount of money promoting the website. (See Hannon Aff. ¶ 8 (stating that Maywood and Balmoral spent approximately $750,000 promoting the "co-branded" pages).)

### 1. **The Youbet Merger and the Twinspires/Youbet Integration**

The seeds of the parties' current dispute were sown in November 2009, when defendant Churchill Downs, Inc. announced that it had reached an agreement to acquire Youbet.com, Inc. (Stip. Facts ¶ 54.) The acquisition, which took the form of a merger between Youbet.com, Inc. and a wholly-owned subsidiary of Churchill Downs, was completed on June 2, 2010. (Id. at ¶ 56.) The surviving company, the defendant Youbet.com, LLC, is the successor-in-interest to the liabilities and obligations of Youbet.com, Inc., including those under the CBA. (Id. at ¶ 57.)[2] The Youbet merger triggered Balmoral's and Maywood's right to terminate the CBA for a change-of-control. (Id. at ¶ 66; see also CBA § 10.2(b).) They

---

[2] For the sake of convenience, we will refer to Youbet.com, Inc. and Youbet.com, LLC as "Youbet," except as otherwise noted.

declined to do so.[3] At the time of the merger Churchill Downs owned a competing ADW-service provider, defendant Twinspires.com ("Twinspires"). (Id. at ¶ 59.) For a period of approximately six months after the merger the two ADW services operated independently.

On November 9, 2010, the defendants informed Balmoral and Maywood that they were going to integrate Twinspires.com and Youbet.com on November 16, 2010. (Id. at ¶¶ 67-68.) After that date visitors to www.youbet.com would be redirected to www.twinspires.com, and eventually defendants would phase out www.youbet.com altogether. (Id. at ¶ 73.) Defendants told plaintiffs that they would take steps to ensure that plaintiffs would continue to be paid for wagers placed by legacy Youbet.com customers on Twinspires' ADW platform. (Id. at ¶¶ 69-71.) In addition, the defendants planned to launch www.youbetillinois.com — the URL that the parties originally contemplated to be the CBA's "Co-Branded Pages." (Id. at ¶¶ 74-75.) Post-integration, plaintiffs would be paid under the CBA for wagers placed by customers who signed up to use the Twinspires ADW platform via

---

[3]  Plaintiffs contend that they were lulled into a false sense of security by defendants' representations that they would "honor" the CBA. (Stip. Facts at ¶¶ 61, 63-64, 66.) Defendants argue that the plaintiffs wanted to be bought out of the CBA, which would not expire until the end of 2011 at the earliest. (Id. at ¶¶ 65, 76-77; see also Defs.' Resp. to Pls.' Mot. for Prelim. Inj. (hereinafter, "Defs.' Resp.") at 6.) It is unnecessary to resolve this dispute to rule on the present motion.

www.youbetillinois.com. (Id. at 72.)[4] The defendants integrated the two wagering platforms, as planned, on November 16, 2010. (Id. at ¶ 79.) Former Youbet customers were able to access their accounts on the new platform using the usernames and passwords that had previously been assigned to them. (Id. at ¶ 81.) And the features of the legacy Youbet service were combined with the features of Twinspires' service. (Id. at ¶ 82.) Plaintiffs now contend that the "migration" of customers from www.youbet.com to www.twinspires.com violated the CBA's anti-assignment clause. (See CBA § 11.7.) But there is currently no evidence in the record that plaintiffs declared a default at that time.

### 2. November & December 2010 Proceedings Before the Illinois Racing Board ("IRB")

An ADW-operator must be licensed by the IRB before it may accept ADW wagers from Illinois residents. (Stip. Facts ¶ 86.) In order to obtain an ADW license, the ADW operator must have a contract with an "organization licensee," i.e., an Illinois racetrack operator. (Id. at ¶¶ 87-91.) Balmoral and Maywood are "organization licensees," and pre-merger, Youbet.com, Inc.'s ADW license was predicated in part on the CBA's existence. (Id. at ¶¶ 89-91.)[5] After the merger Youbet.com, LLC applied for and received

---

[4]/ As we understand the defendant's post-integration plans, Illinois residents who signed up through www.twinspires.com would not be counted as customers under the CBA.

[5]/ Twinspires is an ADW licensee through a contract with Arlington Park, another organization licensee. (Id. at ¶¶ 92-93.)

an ADW license based upon the CBA, and later sought to renew its license for 2011. (Id. at ¶ 95.) At a hearing conducted on November 30, 2010, the IRB's staff recommended that the Board deny Youbet's renewal application because, post-integration, it no longer operated its own wagering platform as required by IRB regulations. (Id. at ¶ 100; see also IRB Hearing Trans., dated Nov. 30, 2010, attached as Ex. C-4 to Blackwell Aff., at 4-6.) Notwithstanding this recommendation, the Board at least contemplated granting the license. (See, e.g., IRB Hearing Trans., dated Nov. 30, 2010, at 31-32.) When representatives of Maywood and Balmoral were asked whether they supported Youbet's application, they equivocated.[6] At the same time, they accused Youbet of "engag[ing] in anti-competitive practices" that violated IRB rules. (Id. at 10-11; 15-16.) The apparent purpose of Balmoral's and Maywood's testimony at the hearing was to obtain leverage in their dispute with the defendants.[7] Rather than deny

---

[6] (Compare IRB Hearing Trans., dated Nov. 30, 2010, at 32 (Maywood/Balmoral representative testifying that he "[didn't] know" whether he supported the staff's recommendation to deny the application); with id. at 37 (the same individual testifying that he "would have no objection if you grant YouBet a license obviously.").

[7] (See IRB Hearing Trans., dated Nov. 30, 2010, at 15 ("We wanted to go on the record and state that we believe them to be in violation of this Board rule, and that conditions be put upon them for their licensing for 2011."); id. at 31 ("We are not asking for a denial. We're asking for conditions."); see also Hannon Email, dated November 10, 2010, attached as Ex. E to Defs.' Resp. ("On Tuesday, November 30th an item on the Board agenda will be the renewal of TwinSpires, Youbet, TVG and Xpressbet Illinois ADW licensees for 2011 — this is good timing for us in our negotiations with [Churchill Downs] for the buy out prior to this Board meeting.").)

YouBet's license on the staff's recommendation, the IRB deferred the matter until the next Board meeting. (Stip. Facts at 102.)

The next day, December 1, 2010, Youbet and Churchill Downs sent a letter to plaintiffs terminating the CBA, citing the provision requiring plaintiffs to "use their best efforts to secure and/or assist Youbet in securing any licenses required or available in Illinois with respect to this Agreement . . . ." (Letter dated Dec. 1, 2010, attached as Ex. C to Pls.' Mot.; Second Am. to CBA § 9; see also CBA § 10.2(d) (permitting either party to terminate "effective upon written notice" for a material breach not cured within 30 days of notice of default).)[8] At the December 21, 2010 IRB meeting, the IRB "tabled" Youbet's renewal application by a 5-4 vote. (Stip. Facts ¶ 109.) Two months later plaintiffs filed this lawsuit.

Plaintiffs allege that the defendants violated the CBA's anti-assignment and confidentiality provisions when they "migrated" Youbet's customer accounts to Twinspires.com (Count I). (See CBA §§ 8, 11.7.) They further claim that the transfer constituted a trade-secret misappropriation on the theory that Twinspires improperly obtained the "Customer List," which the CBA defines as "the list of all Customers who have wagered through the Co-Branded Pages" (Count II). (Id. at § 4.3.) In their opening brief, plaintiffs argued that under either or both legal theories they

---

[8] The defendants' letter also cited CBA § 10.2(f), although it is difficult to see how that provision applies here.

were entitled to an injunction prohibiting the defendants from "using" the Customer List and requiring defendants to turn it over to the plaintiffs. (Pls.' Mot. at 1.) Shortly after plaintiffs filed their motion, the defendants gave plaintiffs a list purporting to identify all Illinois-based customers (numbering approximately 5,500) who had signed up for Youbet's ADW service during the CBA's term. (Stip. Facts ¶ 112.) The list includes the customers' names, mailing addresses, email addresses, and the dates that they registered with Youbet. (Id. at ¶ 113.) As we will discuss in more detail below, plaintiffs' interpretation of the CBA and the scope of the injunction that they have requested have changed since they filed their motion. Currently, they seek the following relief: (1) an order compelling the defendants to transfer to plaintiffs' new ADW service the customer accounts of any Illinois-based customers who registered with Youbet during the CBA's term; or, in the alternative, (2) the usernames or account numbers for those same customers.

## DISCUSSION

**A. Legal Standard**

"To justify a preliminary injunction, the plaintiffs must show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm without the injunction, that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. These considerations are

interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." Judge v. Quinn, 612 F.3d 537, 546 (7th Cir. 2010) (citations omitted).

**B. Likelihood of Success on the Merits**

We will address plaintiffs' breach-of-contract claim first, which they characterized as their "main" legal theory at the preliminary-injunction hearing.

**1. Breach of Contract**

In order to establish a likelihood of success on the merits, the plaintiffs need only show a "better than negligible chance of succeeding." See Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir. 1999). We conclude that they have cleared this low threshold with respect to their claim that defendants violated the CBA's anti-assignment clause. Section 11.7 of the CBA prohibits the parties from delegating their obligations under the contract, "either in whole or in part, whether by operation of law or otherwise, without the prior written consent of the other party." (CBA § 11.7.) It is apparently undisputed that after November 16, 2010 Youbet.com, LLC, Youbet.com, Inc.'s successor-in-interest, no longer performed any of the ADW services that the CBA obligated it to perform. (See CBA § 3.1.a.) Instead, those services were performed by Twinspires. Section 11.7 does not create an exception for assignments or delegations to corporate affiliates, and at least at this stage of the case, we are not persuaded by defendants'

argument that the migration was not a delegation because the integrated platform was similar or superior to Youbet's. If, post-migration, Youbet could still be said to have had a "standard offering of the Service" (CBA § 1) — which we doubt — then it was implemented by delegating ADW operations to a third party. Defendants needed plaintiffs' prior written consent to make such a change. The fact that plaintiffs could (or should) have anticipated the integration after the merger is irrelevant: plaintiffs' rights under the CBA's change-of-control and anti-assignment provisions are distinct.

However, plaintiffs' claim for injunctive relief — as opposed to damages, which "are the norm in breach of contract as in other cases" (see Walgreen Co. v. Sara Creek Property Co., B.V., 966 F.2d 273, 274 (7th Cir. 1992)) — hinges on their argument that the CBA entitles them to the Illinois customers who registered with Youbet during the contract's term. Plaintiffs initially argued that § 4.3 ("Ownership of Customer List") entitled them to exclusive ownership of the Customer List:

> Upon the expiration of the term of this Agreement, Associates will have joint ownership of the list of Customers who have wagered through the Co-Branded Pages (the "Customer List"). In the event this Agreement is terminated by Company for cause set forth in Section 10.2 Associates shall not be entitled to obtain a list of customers who were customers of www.Youbet.com prior to the effective date of this Agreement.

(CBA § 4.3.)[9] "[J]oint ownership," the plaintiffs argued, meant joint ownership solely <u>among</u> the Associates. (Pls.' Mot. at 4-5.) Defendants responded that "joint ownership" means ownership <u>between</u> the Associates and Youbet, pointing out that the CBA uses the term "Associates" predominately as a singular noun. (Defs.' Resp. at 15-17.) Moreover, Youbet maintained and controlled the list during the CBA's term, and there is no language in § 4.3 specifically divesting Youbet of that control. During pre-hearing discovery plaintiffs changed course and effectively adopted the defendants' interpretation of § 4.3's first sentence.[10] But they argued that if Youbet terminated the agreement early, then pursuant to the second sentence the Associates would own the Customer List exclusively. (Hannon Dep. at 53-54, 63-65; <u>see also</u> Hannon Reply Aff. ¶¶ 23-24.) Exclusive ownership of the Customer List, they argued, was tantamount to exclusive "ownership" of the customers and their accounts. (Email from S. Groth to P. Veith, attached as Ex. B-1 to Defs.' Resp. ("We will be asking the court to rule that delivery of the Customer List equates to delivery of the customer

_____

[9] At the preliminary injunction hearing plaintiffs pointed out that § 4.3 does not indicate what happens to the Customer List if one or more of the Associates terminates for cause. The point is academic, however, because Youbet terminated for cause on December 1, 2010, and §§ 4.3 and 10.4 clearly spell out the parties' obligations in that event. Youbet may have breached the contract two weeks earlier, but there is no evidence that the plaintiffs provided the termination notice required by § 10.2(d) at that time.

[10] (<u>See</u> Hannon Dep., attached as Ex. K. to Defs.' Resp., at 54, 63 (testifying that Youbet and the Associates would jointly own the Customer List when the CBA expired); <u>see also</u> Hannon Reply Aff., attached as Ex. C to Pls.'s Reply, ¶ 23 (same); Pls.' Reply at 17.)

accounts . . . ."); see also Hannon Dep. at 52, 90 (stating that he made no distinction between owning the Customer List and "owning" the customers).) There is simply no basis in the CBA for construing "list" to mean "customers," contrary to the ordinary meaning of these terms.[11] And while we agree with the parties that the first sentence of § 4.3 gives the Associates and Youbet "joint ownership" of the Customer List, there is no textual support in the immediately succeeding sentence for granting the Associates exclusive ownership in the event of an early termination. (See CBA § 4.3 ("In the event this Agreement is terminated by Company for cause set forth in Section 10.2 Associates shall not be entitled to obtain a list of customers who were customers of www.Youbet.com prior to the effective date of this Agreement.").  Besides finding no support in the CBA's language, this interpretation creates the absurd result that Youbet would lose the Customer List even if the Associates deliberately breached the contract.

In their reply brief plaintiffs took a different tack, which they spelled out somewhat more clearly at the preliminary injunction hearing. The Associates "own" the customers, not because the "Customer List" means the customers, but because: (a) these were Balmoral's and Maywood's customers during the CBA's term; (b) Youbet breached the CBA; therefore (c) "equity requires that those customers be transferred to Maywood and Balmoral."

---

[11]/ At the preliminary injunction hearing plaintiffs effectively abandoned this argument.

(Pls.' Reply at 8-11.)  Section 4.2, which the plaintiffs cite to support this argument, simply required Youbet to use "reasonable efforts" to "transfer" its existing Illinois customers to the Co-Branded Pages.  (CBA § 4.2.)  As originally contemplated by the parties, wagers placed through the Co-Branded Pages would be included in the CBA's fee calculation.  (See CBA § 6.)  In practice, Youbet did not create a separate co-branded website, and instead calculated fees based on the wagers placed by all Illinois-based customers on www.youbet.com.  Nothing in § 4.2 or the parties' performance indicates that these customers — whether they opened Youbet accounts before or after the parties executed the CBA — "belong[]" to Balmoral and Maywood.  (Cf. Pls.' Reply at 8.)  These customers created ADW accounts with Youbet, and by using Youbet's service they agreed to abide by Youbet's terms and conditions.  Customers who were steered to the website by the parties' joint-marketing efforts did not have any direct relationship with the plaintiffs.  Indeed, plaintiffs had only limited rights to access information about these customers during the CBA's term.  Plaintiffs did not "own" these customers or their accounts.  They had, instead, the right to compensation based upon the customers' wagering activity and the opportunity at the end of the contract to solicit their business using the Customer List.  We will not rewrite the contract to require defendants to transfer

customer accounts to an ADW service that did not even exist before plaintiffs filed this lawsuit.

Finally, we reject plaintiffs' alternative argument that the CBA requires defendants to supply more information about the customers than they have already provided. Nothing in the CBA indicates that the Customer List described in § 4.3 must contain more than the actual names of the Illinois-based customers who wagered on www.youbet.com during the CBA's term. Plaintiffs point out that as part of its marketing obligations under the CBA, Youbet agreed to pay for and coordinate "data mining and targeted messaging to customers." (CBA § 2.2.) Plaintiffs argue that this provision required Youbet to compile the customers' account information and wagering activity. (Pls.' Reply at 16.) That may be so, and knowing that information may give Twinspires a post-CBA competitive advantage, but that does not make it part of the Customer List. At the preliminary injunction hearing plaintiffs refined their request, asking only for the usernames or account numbers for the individuals identified on the list defendants gave them. With this information, plaintiffs contend that they can determine the customers' wagering activity themselves using reports that Youbet gave them periodically during the CBA's term. (See Hannon Dep. at 62.) The fact that this information would make the wagering reports more useful is irrelevant. The CBA simply does not support plaintiffs' argument that they are entitled to any and

all customer information that would help them compete with Twinspires.

### 2. Trade Secret Misappropriation

Plaintiffs contend that the Customer List is a trade secret. The Illinois Trade Secret Act defines "trade secret" as follows:

> "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2. Even if we assume that the Customer List meets this definition, the assignment and/or delegation to Twinspires was not a misappropriation. "A trade secret misappropriation involves the acquisition of a trade secret through improper means, which requires the breach of a confidential relationship or other duty to maintain secrecy." Seng-Tiong Ho v. Taflove, --- F.3d ----, 2011 WL 2175878, *11 (7th Cir. June 6, 2011) (slip op.); see also 765 ILCS 1065/2(a), (b). Under the CBA's terms, the plaintiffs did not control, maintain, or "own" the Customer List prior to termination. (See CBA § 4.3.) They had only a limited right to inspect Youbet's books and records, including "all pertinent information relating to . . . Customers." (CBA § 6.5)

Youbet, for its part, did not have any specific contractual obligation to keep the Customer List secret from corporate affiliates (or from anyone else, for that matter). Section 8.2, which authorized the parties to designate certain materials confidential, is inapplicable. (CBA § 8.2.) Plaintiffs did not "disclose" the Customer List to Youbet and designate it confidential, as § 8.2 contemplates. Defendants may have breached the CBA's anti-assignment clause, but in doing so they did not violate any property rights plaintiffs had in the Customer List.[12] We conclude that plaintiffs' trade secret claim does not satisfy even the low threshold for likelihood of success.

**C. Irreparable Harm & Adequate Remedy at Law**

Plaintiffs argue that they have suffered irreparable harm because they have lost customers. Plaintiffs, who did not own or operate a functioning ADW service at any point relevant to this lawsuit, did not lose ADW customers. (Cf. Pls.' Mot. at 9-10.) They lost fees based on the wagering activity of customers using Youbet's ADW service. (See supra § B.1.) Damages are an adequate remedy insofar as plaintiffs seek to recover those fees and/or advertising expenses. (See Compl. ¶¶ 54-57 (requesting such relief).) It is true that defendants did not turn over the

---

[12]/ Plaintiffs also base their preliminary injunction claim on CBA § 11.4, which authorizes an action for injunctive relief for breach "of any confidentiality or proprietary rights provision of this Agreement." (See Pls.' Reply at 12.) For the reasons we have just discussed, this provision is inapplicable: the customer "migration" did not implicate the CBA's "confidentiality or proprietary rights" provisions. (Cf. CBA §§ 5, 8.)

Customer List within 7 days after termination, as the CBA required. (See § 10.4.) But plaintiffs did not demand the list prior to filing their preliminary injunction motion, approximately five months after receiving Youbet's termination notice. (Stip. Facts ¶ 111); see also Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered.").[13] And since obtaining the Customer List in April, they have not used it to promote their nascent ADW business, despite James Hannon's testimony that it would cost plaintiffs virtually nothing to send promotional material via email to the customers on the list.[14] Even if plaintiffs had been harmed by the delay, this type of harm does not support injunctive relief. See Machlett Labs., Inc. v. Techny Indus., Inc., 665 F.2d 796, 796 n.2, 798 (7th Cir. 1981) (injuries that have already occurred generally do not support injunctive relief). We conclude that plaintiffs have not been irreparably harmed, and that they have an adequate legal remedy.

---

[13]/ Even if we consider plaintiffs' complaint a constructive demand for the Customer List, plaintiffs filed it more than three months after receiving the termination notice.

[14]/ Hannon testified that blindly emailing the 5,500 customers on the list could subject plaintiffs to liability, or at least create customer bad will. But there is no evidence, or even any suggestion, that a customer's username and/or account number would tell plaintiffs whether, for instance, a particular customer had a gambling addiction or had elected not to receive promotional materials.

**D. Balance of the Harms**

We agree with the defendants that transferring customer accounts overnight to a new ADW service would upset customers, and it is probable that some of those customers would never return to Twinspires. The fact the customers might also blame plaintiffs is cold comfort for the defendants. Indeed, even if we had found some basis in the CBA or trade-secret law to support such relief, we would be reluctant to upset the status quo in this way. Luring away Twinspires' existing customers with a new ADW service may be challenging, but that is plainly what the CBA contemplates. Turning to plaintiffs' alternative request for relief, defendants conceded at the hearing that it would cost them very little to disclose the customers' usernames or account numbers. We have already concluded, however, that the CBA does not require defendants to disclose that information. Defendants are not obligated to help their competitors, even if they can do so without significant harm to themselves. The balance of harms favors denying the injunction.

**E. Public Interest**

As plaintiffs point out, the public interest generally favors contract enforcement and trade-secret protection. (See Pls.' Mot. at 12-13.) For the reasons we have already discussed, however, those policies do not support imposing the injunction that the plaintiffs have requested. The public interest would be harmed,

not furthered, if we rewrote the CBA in the name of equity or relied on a tort theory to circumvent its express terms.

## **CONCLUSION**

Plaintiffs' motion for a preliminary injunction (13) is denied. A status hearing is set for July 27, 2011 at 10:30 a.m.

DATE:     July 21, 2011

ENTER:    _____
          John F. Grady, United States District Judge