11-1028.131-RSK                                        June 18, 2013

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BALMORAL RACING CLUB, INC.,         )
MAYWOOD PARK TROTTING CLUB          )
ASSOCIATION, INC., and THE          )
ILLINOIS HARNESS HORSEMEN'S         )
ASSOCIATION, INC.,                  )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )     No. 11 C 1028
                                    )
CHURCHILL DOWNS, INC., CHURCHILL    )
DOWNS TECH. INITIATIVES CO. d/b/a   )
TWINSPIRES.COM and YOUBET.COM, LLC, )
                                    )
          Defendants.               )

### MEMORANDUM OPINION

Before the court are: (1) the defendants' motion for summary judgment; (2) the plaintiffs' motion for summary judgment; and (3) the defendants' motion to strike certain exhibits and factual assertions. For the reasons explained below, we deny the parties' motions.

### BACKGROUND

**A.    The Co-Branding Agreement ("CBA")**

Plaintiffs Balmoral Racing Club, Inc. ("Balmoral") and Maywood Park Trotting Association, Inc. ("Maywood") operate horse-racing tracks located near Chicago, Illinois. (Pls.' Stmt. of Material Facts in Supp. of Mot. for Summ. J. (hereinafter, "Pls.' Stmt.") ¶ 1.) On December 13, 2007, Balmoral, Maywood, Fairmount Park, Inc.

- 2 -

("Fairmount"), Hawthorne Racecourse, Inc., and Suburban Downs, Inc.[1] entered into the CBA with Youbet.com, Inc. ("Youbet"). (Id. at ¶ 6; see also CBA, attached as Tab 16 to Defs.' Appx. in Supp. of Rule 56 Stmts. (hereinafter, "Defs.' Appx.").) At that time, Youbet operated an advanced deposit wagering ("ADW") service that permitted online wagering on horse races. (Pls.' Stmt. ¶ 8.)[2] Pursuant to the CBA, Youbet agreed to develop a "co-branded version" of its primary website, "www.youbet.com" (the "Co-Branded Pages"). (CBA Recitals ¶ D; see also id. at § 1.) The agreement originally contemplated the development and promotion of a separate website, "www.youbetillinois.com," but the parties later agreed to use "www.youbet.com" as the Co-Branded Pages. (Pls.' Smt. ¶ 11.)[3] The parties mutually agreed to promote the Co-Branded pages "in order to maximize the number of visitors." (CBA § 2.1; see also id. at § 2.2.)

---

[1] We will follow the parties' lead and refer to Hawthorne Racecourse, Inc. and Suburban Downs, Inc. collectively as "Hawthorne" because they share a common owner. (See Defs.' Rule 56.1(a)(3)(C) Stmt. ¶ 42.) Fairmount and Hawthorne, like Balmoral and Maywood, own and operate horse-racing tracks in Illinois. (Id.)

[2] ADW is a form of pari-mutel wagering on horse races in which an individual establishes an account with a licensed entity, deposits money into that account, and uses the account balance to pay for wagers via the Internet or telephone. (Defs.' Rule 56.1(a)(3) Stmt. (hereinafter, "Defs.' Stmt.") ¶ 15.) A portion of the money wagered is returned to the winning bettors, a portion is paid to the horsemen, a portion is paid to the state, and a portion is paid to the host track. (Id. at ¶ 17.)

[3] The parties' agreement to use www.youbet.com as the Co-Branded Pages was not reduced to writing. (See Defs.' Stmt. ¶ 37.)

- 3 -

Under the CBA, the tracks (referred to in the agreement as "Associates") were entitled to a share of wagers placed through www.youbet.com by Illinois residents, including Illinois residents who were already Youbet customers when the parties executed the CBA. (See Pls.' Stmt. ¶ 8; Defs.' Stmt. ¶¶ 25, 28.) The Associates' fees were calculated and distributed as follows:

> The Company [Youbet] shall retain one-third (1/3) of Net Commissions plus one-third (1/3) of breakage plus one-third (1/3) of Net Revenues (collectively, "Company Fees"). After deducting the Company Fees, the remainder of Net Commissions, breakage and Net Revenues will be paid to Associates. The Company will pay such amounts to Associates in accordance with written instructions signed by all Associates.

(See Second Am. to CBA § 6.1.)[4] The Associates agreed to split their potion of Net Commissions, breakage, and Net Revenues according to the "distribution by zip code" set forth in Profit and Loss Statements ("P&L's") prepared by Youbet: approximately 10% to Fairmount, with the balance divided between Hawthorne (52.5%) and Maywood/Balmoral (47.5%). (See Defs.' Rule 56.1(b)(3)(C) Stmt. ¶ 54; see also Hannon Dep. 2012, attached as Ex. N to Pls.' Supp. Designation of Evidence, at 182.)

**B. Fairmount**

After signing the CBA, the Associates agreed that Fairmount's share of CBA fees would be placed into an escrow account because Fairmount was concerned about the legality of ADW in Illinois.

---

[4] "Net Commissions" and "Net Revenues" are defined in the agreement at §§ 6.2 and 6.3, respectively. "[B]reakage" is not defined.

- 4 -

(Defs.' Rule 56.1(b)(3)(C) Stmt. ¶ 46.)  Fairmount decided in early 2009 that it no longer planned to participate in the CBA.  (Id. at ¶ 47; Pls.' Stmt. ¶ 19.)  The plaintiffs sought to negotiate with Fairmount to obtain Fairmount's share of the CBA fees, (see Defs.' Rule 56.1(b)(3)(C) Stmt. ¶ 48), but the outcome of those negotiations is unclear.  There is evidence in the record that Hawthorne and Balmoral/Maywood split the money (approximately $78,000) that was being held in the escrow account for Fairmount's benefit.  (See Hannon Dep. 2012 at 230-31.)  But the record does not disclose any specifics about this transaction.  The parties agree, however, that Youbet stopped paying Fairmount's share of CBA fees in June 2009.  (See Defs.' Rule 56.1(b)(3)(C) Stmt. ¶ 49.)  In October 2009, Fairmount entered into an ADW agreement with a competing ADW provider, contrary to the CBA's exclusivity provision.  (Id. at ¶ 50; see also CBA § 4.1.)

**C.   The Youbet Merger & ADW Platform Integration**

On November 11, 2009, defendant Churchill Downs, Inc. ("Churchill") announced that it had reached an agreement to acquire Youbet.  (Defs.' Stmt. ¶ 29.)  The transaction, which the parties finalized on June 2, 2010, took the form of a merger between Youbet and a wholly-owned subsidiary of Churchill.  (Id. at ¶ 30.)  The surviving entity, Tomahawk Merger, LLC, was renamed Youbet.com,

LLC. (Id.)[5] The merger triggered the plaintiffs' right to terminate the CBA. (See CBA § 10.2(c) (authorizing the Associates to terminate the CBA with 30 days notice if there is a change-of-control transaction affecting Youbet).) The plaintiffs chose not to exercise their termination right, although the parties dispute why. The plaintiffs contend that they did not terminate the CBA because of Churchill's assurances that Youbet would continue to honor the agreement's terms. (See Pls.' Stmt. ¶ 31; see also Defs.' Stmt. ¶ 34.)[6] The defendants contend that the plaintiffs were motivated instead by their desire to be bought out of the agreement. (See Defs.' Rule 56.1(b)(3)(B) Stmt. ¶ 31.)

At the time of the merger, another Churchill subsidiary — defendant Churchill Downs Technical Initiatives Company, d/b/a TwinSpires.com ("TwinSpires") — operated a competing ADW service. (Defs.' Stmt. ¶ 31; see also Pls.' Stmt. ¶¶ 3, 32.) The two companies operated separate ADW services for a period of time after the merger, but soon began preparing to integrate the two ADW

---

[5] Although Youbet.com, Inc. ceased to exist as a separate corporate entity, the parties agree that the new entity succeeded to the company's rights and duties under the CBA. (See Pls.' Stmt. ¶ 26); see also U.S. Shoe Corp. v. Hackett, 793 F.2d 161, 163-64 (7th Cir. 1986). For the sake of convenience, we will refer to both Youbet.com, Inc. and Youbet.com, LLC as "Youbet."

[6] The plaintiffs contend that Churchill representatives assured the Associates that the two ADW platforms would always remain separate. (See Pls.' Stmt. ¶ 31.) They rely on the deposition testimony of James Hannon, a representative of Balmoral and Maywood. Hannon's testimony is unclear, however, about whether he received explicit assurances to that effect or, instead, whether that was simply his understanding of what it meant to "honor" the CBA. (See Hannon Dep 2011, attached as Ex. A to Pls.' Designation of Evidence in Supp. of Mot. for Summ. J. (hereinafter, "Pls.' Designation") at 137-39; Hannon Dep 2012, attached Ex. B to Pls.' Designation, at 249-50.)

- 6 -

platforms. (<u>See</u> Defs.' Stmt. 39.)  The plaintiffs were aware that Churchill had publically expressed its intent to eventually integrate the two ADW platforms under one brand name. (<u>See id.</u> at ¶ 33.)  But the defendants did not tell the plaintiffs about their specific plans until November 9, 2010.  (<u>Id.</u> at ¶ 40.)  On that date, Bradley Blackwell (an officer of Churchill, TwinSpires, and Youbet) and Lucky Kalanges (a legacy Youbet employee) convened a conference call with representatives of the Associates, including Hannon.  (<u>Id.</u>)  During the call Blackwell and Kalanges told the Associates that, on November 16, 2010, the defendants were going to integrate the Youbet and TwinSpires ADW platforms — combining the best features of both — under the TwinSpires brand name.  (<u>Id.</u> at ¶¶ 40-41.)  Current Youbet customers would have access to the integrated platform using their existing Youbet user names, passwords, and account balances.  (<u>Id.</u> at ¶ 42.)  The defendants would assign "cable codes" to those customers, permitting the parties to continue tracking their wagering activity in order to calculate the Associates' CBA fees.  (<u>Id.</u> at ¶ 43.)  The defendants would phase out www.youbet.com over time and establish a new URL, www.youbetillinois.com.  (<u>Id.</u> at ¶ 44.)  New customers who signed up through the new URL would be counted as customers under the CBA for purposes of calculating the plaintiffs' fees regardless of which URL — www.twinspires.com, www.youbet.com, or www.youbetillinois.com — they used to access the platform.  (<u>Id.</u> at

¶ 47.) However, the plaintiffs would not be entitled to fees for wagers placed by new customers who signed up to use the service after integration through either www.youbet.com or www.twinspires.com. (Id. at ¶¶ 47, 58.)

After hearing the defendants' integration plans, Hannon asked the defendants to continue counting as CBA "Customers" new customers who signed up to use the integrated platform through www.youbet.com. (Id. at ¶ 50.) Blackwell told Hannon that he would look into his request. (Id.) Hannon emailed Blackwell the following day and pressed the point more forcefully, demanding that the Associates get the benefit of new customer sign-ups through www.youbet.com "for a period of time." (Id. at ¶ 51.) On November 11, 2010, Blackwell agreed to credit the Associates for wagers placed by new customers who signed up via www.youbet.com through the end of 2010. (Id. at ¶ 53.) Hannon responded that he was satisfied with the change. (Id. at ¶ 53; see also id. at ¶¶ 59-61 (Hannon emailed certain interested parties about the changes and testified at his deposition that the emails were consistent with his "agreement" with Blackwell concerning "how customers and wagers would be tracked under the [CBA] after the migration.").) The defendants emphasize that the plaintiffs did not assert at that time that the integration breached the CBA. (See id. at ¶¶ 54-55.) The plaintiffs contend that Hannon voiced his dissatisfaction during other conversations with Blackwell, (see Pls.' Rule

- 8 -

56.1(b)(3)(B) Stmt. ¶¶ 54-55), but Hannon's testimony on this subject is vague. (See Hannon Dep. 2012, attached as Tab 12 to Defs.' Appx., at 34-37 (testifying vaguely about subsequent communications with Blackwell about his unhappiness with the integration).) It is undisputed that the plaintiffs did not send a written notice of breach at that time. (Defs.' Stmt. ¶ 56; see also CBA § 10.2(d) (authorizing the parties to terminate the CBA for a material breach that is not cured within 30 days after providing written notice thereof).) On November 16, 2010, the defendants integrated the Youbet and TwinSpires ADW platforms consistent with their representations the prior week. (Defs.' Stmt. ¶¶ 62-64.)

### D. Youbet's License Renewal Application and the CBA's Termination

The Illinois Horse Racing Act requires ADW providers to obtain a license from the Illinois Racing Board ("IRB"). See 230 ILCS 5/3.28 ("An advance deposit wagering licensee shall be an organization licensee or a person or third party who contracts with an organization licensee in order to conduct advance deposit wagering.");[7] 5/3.29 ("Any person who accepts an advance deposit wager who is not licensed by the Board as an advance deposit wagering licensee shall be considered in violation of this Act and the Criminal Code of 2012."). In June 2010, Youbet.com, LLC (the

---

[2/] An "organization licensee" is licensed to conduct horse races. See 230 ILCS 5/3.11.

new entity) applied for and received a license to operate its ADW platform in Illinois through December 31, 2010. (See Defs.' Rule 56.1(a)(3)(C) Stmt. ¶¶ 24, 26.) On October 29, 2010, Youbet submitted an application to renew its ADW license for 2011. (Defs.' Stmt. ¶ 67.) On November 10, 2010 — the day after the conference call regarding the YouBet/TwinSpires integration — Hannon spoke with Marc Laino, the IRB's Executive Director.[8] (Id. at ¶ 70.) In an email summarizing his conversation with Laino, Hannon stated that he told Laino about the integration and about a "possible illegal business practice." (Id.) He went on to indicate that he regarded Youbet's license renewal application as a possible bargaining chip in his negotiations for a buy out. (See id. ("On Tuesday, November 30th an item on the Board agenda will be the renewal of Twinspires, Youbet, TVG and Xpressbet Illinois ADW licensees [sic] for 2011 — this is good timing for us in our negotiations with CDI for the buy out prior to this Board meeting.").) On November 26, 2010, Hannon sent an email to a representative of Day at the Track, another ADW operator, stating: "things are progressing slowly with [Churchill] — (getting out of my Youbet contract) however, they are still moving forward — we are asking for conditions to be put on them when they go up for licensing next week therefore, we hope they will now want out of the contract." (Id. at ¶ 71.) Before the November 30, 2010 IRB

---

[8] Laino's duties as Executive Director include the "review and investigation of license applications . . . ." (See Laino Aff., attached as Ex. I to Pls.' Designation, ¶ 2.)

- 10 -

meeting, Hannon sent a memo to IRB members entitled "Youbet Concerns" that listed a range of grievances including alleged "credit card abuse" and CBA violations. (Id. at ¶ 72.) In the memo, Hannon urged the IRB to "postpone the licensing of Youbet LLC until the December Board meeting in order to give the parties to the Agreement more time to resolve these issues." (Id.) Laino opened the November 30 IRB meeting by recommending that the Board deny Youbet's application because Youbet was no longer eligible for an ADW license after the integration. (See Trans. of IRB Meetings, dated Nov. 30, 2010, attached as Tab 27 to Defs.' Appx., at 6; Laino Aff. ¶ 13.)[9] During the course of the meeting, Hannon (1) accused Youbet of "anticompetitive practices" that he said should be brought to the "Justice Department's attention;" (2) asked the Board to "investigate [Youbet's] license based on these anticompetitive practices and rule violations . . . ;" and (3) asked that the Board place "conditions" on Youbet before granting its license application. (Defs.' Stmt. ¶ 75.) The IRB ultimately chose to defer further consideration of Youbet's renewal application until the Board's December 21, 2010 meeting. (Id. at ¶ 77.)

On December 1, 2010, Youbet notified the plaintiffs that it was terminating the CBA (as to plaintiffs) based upon their failure

---

[9]/ We discuss the bases for Laino's recommendation in greater detail later in this opinion.

- 11 -

to use their "best efforts" to assist Youbet in renewing its ADW
license.  (Id. at ¶ 79; see also CBA § 10.2(d) (termination for
cause); Second Am. to CBA § 9 ("best efforts" clause).)  On that
same day, Youbet notified Hawthorne that it was terminating the CBA
(as to Hawthorne) because Youbet had learned that Hawthorne had
entered into an agreement with another ADW provider.  (Defs.' Rule
56.1(b)(3)(C) Stmt. ¶ 51.)  The plaintiffs responded with their own
notice of material breach on December 20, 2010 citing, among other
things, the alleged assignment and delegation of the CBA to
"[Churchill], TwinSpires and/or Youbet.com, LLC." (See Letter from
D. Brown and S. Groth to B. Blackwell, dated Dec. 20, 2010,
attached as Tab 51 to Defs.' Appx.)  The plaintiffs filed this
lawsuit on February 14, 2011, alleging breach of contract (Count
I), trade secret misappropriation (Count II), and tortious
interference (Count III).

## DISCUSSION

The parties have filed cross-motions for summary judgment on
the plaintiffs' claim for breach of contract, only.  "The court
shall grant summary judgment if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In
considering such a motion, the court construes the evidence and all
inferences that reasonably can be drawn therefrom in the light most
favorable to the nonmoving party.  See Pitasi v. Gartner Group,

<u>Inc.</u>, 184 F.3d 709, 714 (7th Cir. 1999). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Talanda v. KFC Nat'l Mgmt. Co.</u>, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

**A.   The Defendants' Motion to Strike**

In their opening brief, the plaintiffs argued that the defendants knew as early as June 2010 that integrating the Youbet and TwinSpires ADW platforms would imperil Youbet's license. (Pls.' Mem. at 13-14.) In support of this contention, they quoted the following email from IRB staff member Mickey Ezzo:

> We have a question about the acquisition of Youbet by CDI. It's our impression that CDI is going to maintain the Youbet license, therefore, the Board has to approve the ownership change as well as new officers and directors. One of the commissioners thinks that CDI is closing down Youbet and merging the current Youbet customers into TwinSpires, therefore, the current Youbet license would be cancelled. Can you clear this up?

(<u>See</u> Email from M. Ezzo to R. Reed, dated June 18, 2010, attached as Ex. M to Pls.' Supp. Designation of Evidence.) The plaintiffs included the email in their "designation" of evidence, (<u>see</u>

- 13 -

Blackwell Dep. 2012, Dep. Ex. 33, attached as Ex. D. to Pls.'
Designation), but did not address it in their Rule 56.1 statement
of facts. See Jorden v. United States, Nos. 09 C 6814, 10 C 3144,
2011 WL 4808165, *1 (N.D. Ill. Oct. 11, 2011) (it is improper for
a party to cite "raw record materials" instead of its Rule 56.1
statement) (collecting cases). Responding in part to the
plaintiffs' violation of the Local Rules, the defendants sought
(and we granted) leave to file additional statements of fact. (See
Minute Entry, dated December 10, 2012, Dkt. 95.) One of those
statements addresses Enzo's communication: "[w]hen IRB staff member
Mickey Ezzo inquired whether Youbet still needed a license in its
own name, Youbet explained that it sought to maintain that license
in order to honor its contractual commitment to the Associates."
(See Defs.' Rule 56.1(a)(3)(C) Stmt. ¶ 25 (citing Blackwell Decl.
2012 ¶ 33).) In their reply brief, the plaintiffs argue that
Ezzo's email was really a warning about the likely consequences of
integration, and not an innocuous inquiry. They cite two "new"
exhibits: (1) the partially redacted email string including Ezzo's
June 18, 2010 email, which they included with their original
submission (see supra); and (2) the affidavit of IRB member Angelo
Ciambrone. Ciambrone states in his affidavit that he directed Ezzo
to send the email, and that it "was intended to, and did, signal
that an IRB Commissioner believed that the migration of Youbet
customers to TwinSpires and shutting down the Youbet website would

- 14 -

result in cancellation of the Youbet ADW license." (<u>See</u> Ciambrone Aff., attached as Ex. M to Pls.' Supp. Designation of Evidence at ¶¶ 4-5.) According to the plaintiffs, the defendants' redacted internal emails are evidence that they understood the true import of Ezzo's email. (<u>See</u> Pls.' Reply at 9.)

The defendants argue that the plaintiffs have improperly back-filled the record on reply to support statements in their original filing. However, we agree with the plaintiffs that it is appropriate to consider this evidence as responsive to the defendants' characterization of Ezzo's communication in their statement of additional facts. <u>See</u> <u>Beck v. University of Wisconsin Bd. of Regents</u>, 75 F.3d 1130, 1334 n.* (7th Cir. 1996) (a party may file new materials with its reply brief that address arguments raised in the other party's response). We take the defendants' point that the plaintiffs first introduced the subject of Ezzo's email, and that they did so in a way that did not comply with our Local Rules. But their concern that they will be prejudiced if this material is not stricken is unfounded. As we discuss below, there is evidence in the record that the IRB did not consider the integration an insuperable obstacle to renewing Youbet's license. Moreover, the IRB never actually cancelled Youbet's license — it simply deferred ruling on Youbet's renewal application indefinitely. So, the significance of Ezzo's cryptic email in June 2010 is questionable. Finally, the inference that the plaintiffs

seek to draw from the defendants' redactions — _i.e._, that the defendants knew in June 2010 that shutting down Youbet's website would imperil its license — is pure speculation. We do not know what the redacted portions of the emails say, and the plaintiffs have not suggested that the redactions were improper. The defendants' motion to strike is denied.

**B.    The Defendants' Motion for Summary Judgment**

The defendants argue that they are entitled to summary judgment on the plaintiffs' claim for breach of contract because: (1) the plaintiffs agreed to modify the CBA to permit the integration of the two ADW platforms; and/or (2) the plaintiffs are estopped from challenging the integration based upon their acquiescence.

**1.    Modification**

The defendants argue that the plaintiffs agreed to modify the CBA to permit the changes that the defendants disclosed on November 9, 2010 and implemented the following week. "A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed. A valid modification must satisfy all the criteria essential for a valid contract: offer, acceptance, and consideration. A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct

- 16 -

consistent with acceptance." International Business Lists, Inc. v.
American Tel. & Tel. Co., 147 F.3d 636, 641 (7th Cir. 1998)
(citations omitted).  These are fact-intensive questions generally
unsuited for summary judgment.  See Prignano v. Prignano, 934
N.E.2d 89, 810 (Ill. App. Ct. 2010) ("[T]he issues of whether a
contract existed, the parties' intent in forming it, and its terms
are all questions of fact to be determined by the trier of fact.").

The defendants rely chiefly on Hannon's email the day after
the defendants informed the plaintiffs that they were integrating
the ADW platforms:

> Per our conversation yesterday, we are requiring CDI
> (TwinSpires and Youbet), for a period of time, to
> identify then credit as a Balmoral, Maywood, and
> Hawthorne customer, per our Agreement, any person in
> Illinois who initially uses the URL Youbet.com to sign up
> for a new account but is directed to the URL
> TwinSpires.com.
>
> Our companies have invested a considerable amount of
> money marketing the Youbet.com brand name in Illinois
> therefore, we will continue to expect a return in (sic)
> our investment during the time period CDI phases out the
> Youbet.com brand name.  We further understand that we
> will begin marketing YoubetIllinois.com and any person in
> Illinois who signs up for a new account using this URL
> will be identified as a Balmoral, Maywood and Hawthorne
> customer.
>
> We will need CDI assurance that these requirements will
> happen prior to the announced migration date of Tuesday,
> November 16.

(Defs.' Stmt. ¶ 51.)  Blackwell responded by offering to extend
through the end of 2010 the period during which the plaintiffs
would receive fees for wagers placed by new customers via

www.youbet.com. (Id. at ¶ 52.) Hannon indicated that same day that he was satisfied with that particular change. (Id. at ¶ 53 ("I want to thank you for efforts in accomplishing our request/requirement for URL Youbet sign ups . . . .") However, he did not affirmatively state that this was his *only* objection to the integration, and there is evidence in roughly contemporaneous communications that the plaintiffs were *not* satisfied with the changes. (See, e.g., Email from D. Hutchinson to D. Johnston, dated Nov. 29, 2010, attached as Tab 25 to Defs.' Appx. (attaching a document entitled "Youbet Concerns" listing the plaintiffs' grievances, including the transfer of Youbet customers to TwinSpires).) More importantly, the CBA provides that "[a]ny waiver, amendment or other modification of any provision of this Agreement will be effective only if in writing and signed by the parties." (CBA § 11.8.) The defendants point out that the parties had modified the CBA to utilize www.youbet.com as the Co-Branded Pages without a signed document memorializing the change. (See Defs.' Mem. at 15.) But the absence of such a writing is certainly evidence that they did not intend to modify the contract. In the alternative, the defendants argue that the parties' email exchange could constitute a "writing" electronically signed by the parties. (See id.) But as we just discussed, Hannon's email does not unequivocally establish that he agreed to all aspects of the integration. Viewing the evidence in the light most favorable to

- 18 -

the plaintiffs, we conclude that the defendants are not entitled to summary judgment on their theory that the plaintiffs agreed to modify the CBA to permit the Youbet/TwinsSpires integration.


### 2. Estoppel

In the alternative, the defendants argue that the plaintiffs should be estopped from asserting breach of contract. "The elements of estoppel are: (1) a party has acted; (2) another party reasonably relied on those acts; and (3) the latter party thereby changed its position for the worse." LCI Intern. Telecom Corp., Inc. v. American Teletronics Long Distance, Inc., 978 F.Supp. 799, 802 (N.D. Ill. 1997). It is undisputed that the defendants worked for months to integrate the ADW platforms before notifying the plaintiffs. Moreover, there is evidence in the record supporting the plaintiffs' contention that the defendants did not present the integration as a proposal. Instead, they told the plaintiffs, in detail and with only a week's notice, what was *going to happen* on November 16, 2010. Viewing the evidence in the light most favorable to the plaintiffs, there is a genuine dispute of material fact regarding whether the defendants reasonably relied on the plaintiffs' conduct when they integrated the Youbet and TwinSpires ADW platforms.

### C. Plaintiffs' Motion for Summary Judgment

- 19 -

The plaintiffs contend that the defendants breached the CBA by: (1) assigning rights and delegating duties to TwinSpires and Churchill (see CBA § 11.7); (2) failing to maintain the Co-Branded Pages and the Youbet brand (see CBA §§ 1, 3, and 4.2); and (3) failing to maintain Youbet's eligibility for an ADW license (see CBA § 7.2). The elements of a claim for breach of contract are: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a material breach by the defendant; and (4) damages. Reger Development, LLC v. National City Bank, 592 F.3d 759, 764 (7th Cir. 2010) (applying Illinois law); see also Prima Tek II, L.L.C. v. Klerk's Plastic Industries, B.V., 525 F.3d 533, 538 (7th Cir. 2008) ("[A] party can only be held liable for damages resulting from a material breach.") (applying Illinois law). The parties focus their arguments on the third and fourth elements.

### 1. Whether Youbet Breached the CBA

#### (a) Assignment and Delegation

The plaintiffs argue that Youbet improperly delegated certain duties to TwinSpires and Churchill. Section 11.7 of the CBA broadly prohibits assignment and delegation without the opposite party's written consent:

> No party may assign its rights or delegate its obligations hereunder, either in whole or in part, whether by operation of law or otherwise, without the prior written consent of the other party. Any attempted assignment or delegation without such written consent will be void.

- 20 -

(CBA § 11.7.) The record is not as detailed as it could be regarding the specific duties that the plaintiffs accuse Youbet of delegating and how they were delegated. However, we think that the record is sufficiently clear to establish that Youbet at least partially delegated certain duties to its corporate affiliates after the merger. Churchill eliminated certain Youbet data centers and call centers as redundant in light of the corresponding facilities at TwinSpires. (See Pls.' Stmt. ¶¶ 42-43.) "[F]inancial reporting obligations [were] switched from Youbet employees over to [Churchill] employees." (Blackwell Dep. 2012 at 31-33.) Specifically, Churchill employees calculated the fees that the Associates were entitled to under the CBA, (id. at 31), a function previously performed by Youbet. After the merger, Youbet's marketing team was overseen by Jeremy Clemons, a TwinSpires employee. (See Defs.' Rule 56.1(b)(3)(B) Stmt. ¶ 33; Clemons Dep., attached as Tab 9 to Defs.' Appx., at 5.) It appears that Clemons made the decision to eliminate certain Youbet promotional materials, anticipating that the change would "significantly" reduce the "amount of traffic and sign-ups coming to Youbet . . . ." (Pls.' Stmt. ¶ 43.) In sum, Youbet no longer performed its obligations to operate and market the Co-Branded Pages independently. Instead, those obligations were performed, "in whole *or in part*," by TwinSpires and Churchill. (CBA § 11.7 (emphasis added).) Youbet did not obtain the Associates' prior

written consent before delegating these obligations to its corporate affiliates. We conclude, therefore, that Youbet breached § 11.7.

Baxter v. O.R. Concepts, Inc., 69 F.3d 785 (7th Cir. 1995), cited by the defendants, is distinguishable. In Baxter, the plaintiff entered into a distribution agreement with the defendant requiring the plaintiff to purchase $3 million worth of the defendant's products over a 27-month period. Id. at 787. During the contract's term, the defendant's president and majority stockholder sold substantially all of his stock to a third party. Id. The plaintiff argued that the stock sale constituted an assignment in violation of the distribution agreement's anti-assignment clause. Id. at 788. The Baxter Court held that the stock sale was not an assignment, citing the "well settled" principle that "a change in corporate ownership does not constitute a variation of that corporation's contractual obligations." Id. Even assuming that Baxter's reasoning applies to the merger in this case,[10] the plaintiffs have not argued that the merger itself was an assignment/delegation. Instead, their claim is based upon the

_____

[10]/ The anti-assignment clause in Baxter did not prohibit assignments "by operation of law," unlike the CBA. Compare Baxter, 69 F.3d at 788, with CBA § 11.7. Moreover, Baxter involved a stock sale, not a merger. The Court expressly relied on this fact to distinguish its earlier decision in Sally Beauty Co. v. Nexus Products Co., 801 F.2d 1001 (7th Cir. 1996), which held that "a merger between a contracting corporation and another corporation could constitute an assignment of the contracting corporations rights in a contract." Baxter, 69 F.3d at 788 (summarizing the holding in Sally Beauty); see also id. ("[M]ost importantly, the Sally Beauty case involved a merger of two corporations, as opposed to a simple change of ownership. There, the contracting corporation lost its independent identity because of the merger.").

- 22 -

delegation of contractual duties to Youbet's corporate affiliates after the parties completed the merger.[11] It may have made business sense for Youbet to delegate certain duties to Churchill and TwinSpires in the wake of the merger, but it needed the plaintiffs' prior written consent to do so.

### (b) The Co-Branded Pages

The CBA required Youbet to create the Co-Branded Pages on its server with a mutually agreed URL address. (See CBA, Recitals ¶ C; see also id. at § 1.) As originally drafted, the agreement contemplated a website and URL distinct from Youbet's primary site. (See CBA Recitals ¶¶ C-D, §§ 1, 2.2, 3.1.a, 4.2.) The Co-Branded Pages would look like the primary site and offer the same or similar services, (see id. at § 1), and Youbet agreed that it would attempt to drive its existing Illinois customers to the new site. (See id. at § 4.2.) But as we understand the agreement as originally conceived, existing and future Illinois customers were free to place wagers on www.youbet.com. If they did so, the plaintiffs would not be entitled to fees based upon those wagers. (See CBA § 6.) The parties later agreed to modify the CBA to make "www.youbet.com" the Co-Branded Pages. (See Pls.' Stmt. ¶ 11.)

---

[11]/ As the defendants point out, the selling shareholder in Baxter told the plaintiff that the defendant would begin marketing its product jointly with the acquiring company and that the defendant was relocating its headquarters. See Baxter, 69 F.3d at 787. But the Seventh Circuit merely recited these facts, it did not rely on them when analyzing the plaintiff's claims. Also, there is no indication in Baxter that these facts affected any duty that the defendant owed the plaintiff under the distribution agreement at issue in that case.

- 23 -

The change meant that the Co-Branded Pages and Youbet's primary site would not compete for Illinois customers. It also meant that the plaintiffs benefitted from the national marketing of Youbet's brand. (See Defs.' Rule 56.1(b)(3)(B) Stmt. ¶ 12.) The extent to which the plaintiffs directly marketed www.youbet.com is disputed. (See id.) But it is undisputed that they were allocated a portion of Youbet's marketing expenses throughout the CBA's term. (See id.) So, they had a contractual right to, and financial interest in, the continued existence and promotion of www.youbet.com.

The changes that the defendants implemented in November 2010 significantly altered the parties' bargain. The defendants began to phase out www.youbet.com, the website that the plaintiffs had paid to promote for two years. (See Pls.' Stmt. ¶ 34; see also Clemmons Dep. at 47.) And in its place they substituted (1) an integrated ADW platform under the "TwinSpires" brand name; and (2) a new URL, www.youbetillinois.com, contrary to the parties' agreement to use www.youbet.com as the Co-Branded Pages and the Co-Branded Pages URL. The defendants point out that CBA § 1 required Youbet to create Co-Branded Pages with the "functionality and look and feel of [Youbet's] standard offering of the Service." (CBA § 1.) According to the defendants, after the integration www.twinspires.com *became* the "standard offering," and that the change was consistent with Youbet's authority to make "page modifications . . . after the initial design." (CBA § 1.) It

would be a closer case if the defendants had offered to pay the plaintiffs for all wagers placed on www.twinspires.com by customers with Illinois addresses. In that case, the defendants would have a colorable argument that they were simply substituting one *brand* for another while preserving the essence of the parties' bargain. (See Defs.' Resp. at 7, 17.) But after the parties modified the CBA to make www.youbet.com the Co-Branded Pages, Youbet no longer had authority to develop and implement Co-Branded Pages separate from its primary site. Youbet cannot rely on terms in the original agreement that are inconsistent with the modification. See Curia v. Nelson, 587 F.3d 824, 830 (7th Cir. 2009) ("A modified contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract.") (citation and internal quotation marks omitted).

This leaves the defendants' argument that the plaintiffs acquiesced to the material terms of the integration. As we discussed before, the defendants rely chiefly on Hannon's email responding to the defendants' revelation that they were integrating the Youbet and TwinSpires ADW platforms. Viewing the evidence in the light most favorable to the defendants, Hannon and Blackwell expressly agreed to the terms governing new customer sign-ups through www.youbet.com while the defendants phased out that URL. And although Hannon did not expressly state that he was satisfied

- 25 -

with all aspects of the integration, he did indicate that he understood the essential terms and requested only one change, which the defendants granted. (See Defs.' Stmt. ¶ 51 ("We further understand that we will begin marketing YoubetIllinois.com and any person in Illinois who signs up for a new account using this URL will be identified as a Balmoral, Maywood and Hawthorne customer.").) The fact that there is no unequivocal signed writing modifying the contract is significant, but not dispositive. The parties had previously agreed to make www.youbet.com the Co-Branded Pages — a substantial change from the CBA's original terms — without such a document. The plaintiffs note that the parties performed under the modified CBA for two years, whereas only three weeks separate the conference call disclosing the integration and Youbet's termination notice. (See Pls.' Resp. at 10.) Moreover, some of the plaintiffs' conduct during this brief time period was inconsistent with having agreed to modify the contract.[12] But we do not weigh evidence when ruling on a motion for summary judgment. See Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). We conclude that the defendants have

---

[12] Hannon's list of "Youbet Concerns" included the transfer of customer accounts from www.youbet.com to www.twinspires.com. (See Email from D. Hutchinson to D. Johnston, dated Nov. 29, 2010.) On the other hand, there is also evidence in the record that Hannon was merely seeking leverage in his negotiations for a buy-out. (See supra.)

– 26 –

come forward with sufficient evidence of a contract modification to preclude summary judgment.

**(c) YouBet's Eligibility for an ADW License**

The plaintiffs argue that Youbet violated § 7.2 of the CBA because, after the integration, it was no longer eligible for an ADW license. (<u>See</u> CBA § 7.2 (Youbet agreed to "comply with Illinois Law and the Rule of the Illinois Racing Board.").) They cite Laino's affidavit for the proposition that ADW license applicants must satisfy two requirements: (1) the applicant must have its own ADW platform; and (2) the applicant must have a totalizing vendor (a machine or system that calculates odds, records bets, pays out winners, etc.). (<u>See</u> Laino Aff. ¶ 13.) According to Laino, Youbet did not fulfill either requirement after the integration, and he recommended that the IRB deny Youbet's application on that basis. (<u>See</u> <u>id.</u>) There are several problems with the plaintiffs' argument. First, none of the materials that the plaintiffs have cited — including Laino's affidavit — refer to a statute or rule expressly imposing the cited license requirements. Second, the plaintiffs ignore the defendants' argument that the IRB has granted ADW licenses in comparable circumstances. (<u>See</u> Defs.' Resp. at 15; <u>cf.</u> Pls.' Reply at 9.) Third, the IRB considered granting Youbet's application notwithstanding the "technical deficiencies" — if they were deficiencies — that Laino had identified:

I know there were some technical deficiencies in the
application. But the applicant is not withdrawing the
application and there is no objection to the application.
So that's my inclination. Just — by denying the license,
we could cause some trouble. By granting it — I don't
see a downside to granting it.

[. . .]

You know, the delicious irony of all this is last month
— the only reason we didn't issue the license last month
was Balmoral ran up here at the last minute and asked us
not to.

(See Trans. of IRB Proceedings, dated December 21, 2010, attached
as Tab 45 to Defs.' Appx. (testimony of IRB Chairman Joseph
Sinopoli).) Finally, the IRB never voted to grant or deny Youbet's
application — it deferred decision indefinitely. (See Sinopoli
Aff. ¶¶ 16-17.) We conclude that the plaintiffs are not entitled
to summary judgment that Youbet breached CBA § 7.2.

### 2. Whether Youbet's Breach of the CBA's Anti-Assignment Clause Was Material

The defendants argue that any breach of the CBA was immaterial
and therefore cannot support liability. "[A] party can only be
held liable for damages resulting from a material breach." Prima
Tek II, 525 F.3d at 538. "The test of whether a breach is
'material' is whether it is 'so substantial and fundamental as to
defeat the objects of the parties in making the agreement, or
whether the failure to perform renders performance of the rest of
the contract different in substance from the original agreement.'"
InsureOne Independent Ins. Agency, LLC v. Hallberg, 976 N.E.2d
1014, 1027 (Ill. App. Ct. 2012) (quoting Village of Fox Lake v.

- 28 -

Aetna Casualty & Surety Co., 534 N.E.2d 133, 141 (Ill. App. Ct. 1989)). "[T]he determination of 'materiality' is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage." Sahadi v. Continental Illinois Nat. Bank and Trust Co. of Chicago, 706 F.2d 193, 196 (7th Cir. 1983). Accordingly, materiality is "especially unsuited to resolution by summary judgment." Id. at 197.

We conclude that the parties genuinely dispute whether Youbet materially breached the CBA's anti-assignment clause. When ruling on the plaintiffs' preliminary-injunction motion, we held that the plaintiffs' rights under the CBA's change-of-control and anti-assignment provisions are "distinct." Balmoral Racing Club, Inc. v. Churchill Downs, Inc., No. 11 C 1028, 2011 WL 3020776, *4 (N.D. Ill. July 21, 2011). Nevertheless, we think that the plaintiffs' decision not to terminate the agreement pursuant to the change-of-control clause is relevant to the question of materiality. If the plaintiffs believed that Youbet's independence was a central aspect of the CBA, they could have terminated the agreement. Indeed, they were aware in June 2010 that the defendants had publicly announced

their intention to eventually integrate the two platforms under a single brand name. (<u>See</u> Defs.' Stmt. ¶ 33.)  The plaintiffs argue that they were lulled into a false sense of security by the defendants' promises to "honor" the CBA.  But there is evidence in the record that the plaintiffs were motivated instead by a desire to be bought out of the contract.  (<u>See</u> Defs.' Rule 56.1(b)(3)(B) Stmt. ¶ 31; <u>see also</u> Defs.' Stmt. ¶ 71.)  Moreover, the plaintiffs have not cited any evidence indicating that Churchill and/or TwinSpires provided services inferior to the services that Youbet provided before the merger.  A reasonable fact-finder could conclude that any delegation was ancillary to the CBA's main purpose; namely, for the plaintiffs to earn fees for ADW wagers. (<u>See</u> Defs.' 56.1(a)(3)(C) Stmt. ¶ 45 ("Maywood/Balmoral's only 'objective in entering the [CBA] was to share in the revenues generated by wagers made through an ADW service.'") (quoting Hannon Dep. 2012 at 15).)

In sum, although we find that Youbet breached the anti-assignment clause, we conclude that the plaintiffs are not entitled to summary judgment that the breach was material.

**3.  Damages**

Based upon the foregoing discussion, we will deny the parties' summary judgment motions.  However, they have extensively briefed two issues regarding damages that we think it is appropriate to address at this time: (1) whether the plaintiffs' damages may

include fees that would have been paid to Hawthorne but for its termination; and (2) whether the plaintiffs' damages are limited by their alleged breach of the CBA's "best efforts" clause. See Fed. R. Civ. P. 56(g) ("If the court does not grant all of the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case.").

### a.  CBA Section 6.1

The plaintiffs argue that the appropriate measure of damages for defendants' alleged breach includes fees that otherwise would have been paid to Hawthorne.  At issue is the proper interpretation of CBA § 6.1:

> The Company [Youbet] shall retain one-third (1/3) of Net Commissions plus one-third (1/3) of breakage plus one-third (1/3) of Net Revenues (collectively, "Company Fees").  After deducting the Company Fees, the remainder of Net Commissions, breakage and Net Revenues will be paid to Associates.  The Company will pay such amounts to Associates in accordance with written instructions signed by all Associates.

(CBA § 6.1.)  The first step is to determine whether this provision is ambiguous, a question of law for the court.  See Metalex Corp. v. Uniden Corp. of America, 863 F.2d 1331, 1333 (7th Cir. 1988). If we determine that the contract is ambiguous, then the meaning of the disputed term becomes a question of fact for the jury.  Id.  We agree with the plaintiffs that § 6.1 is unambiguous on its face: it provides that Youbet will retain 1/3 of the applicable fees and

that the Associates will receive the "remainder," to be distributed by Youbet according to the Associates' written instructions. We conclude, however, that a latent ambiguity emerges when this provision is applied to the particular facts of this case. See Napleton v. Ray Buick, Inc., 704 N.E.2d 864, 872 (Ill. Ct. App. 1998) ("A latent ambiguity exists where a contract's terms are clear on their face, but extrinsic evidence creates uncertainty as to the meaning of the terms."). When the parties executed the CBA, there were four Associates. Now only two of the Associates (Balmoral and Maywood) assert a claim to the fees remaining after subtracting the "Company Fees." Does that mean, as the plaintiffs argue, that they are entitled to the *entire* "remainder" if they prevail on their breach of contract claim? Or, as the defendants maintain, are they only entitled to the portion (47.5%) that they received during the CBA's term?

We turn, first, to the CBA's other provisions. See Thompson v. Gordon, 948 N.E.2d 39, 47 (Ill. 2011) ("A contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract.") (internal citation omitted). Both parties cite CBA §§ 10.2(i) and (j) to support their arguments:

> (i)  In the event that Company terminates this Agreement with an Associate for cause pursuant to the provisions of this section, the termination shall only affect the terminated Associate.

(j)  In the event any Associate terminates this Agreement
with Company for cause pursuant to any of the provisions
of this section, such termination shall only affect the
terminating Associate.

(CBA §§ 10.2(i) and (j).)  The plaintiffs argue that these
provisions indicate that "the parties did not intend for the rights
of the Associates as a group to be affected by the actions of any
individual Associate." (Pls.' Mem. at 17.)  According to the
plaintiffs, this means that Youbet and the Associates must always
split the applicable fees in the proportion established in § 6.1
(one-third to Youbet, two-thirds to the "Associates"), no matter
how many Associates still assert claims under the CBA.  The
defendants argue that the other Associates would be "affected"
(contrary to § 10.2(i) and (j)) if their portion of the "remainder"
increased after Youbet terminated the CBA as to another Associate
for cause.  After all, the CBA says "affected," not *adversely*
affected.  Both side's arguments are reasonable, leaving the
ambiguity in § 6.1 unresolved.  We turn, then, to extrinsic
evidence.  See Thompson, 948 N.E.2d at 441 ("If the contract
language is ambiguous, a court can consider extrinsic evidence to
determine the parties' intent.").

The plaintiffs argue that the parties' course of dealing
supports their interpretation, citing: (1) the parties' P&L
statements; and (2) the parties' handling of Fairmount's portion of
the ADW fees.  But the record is not as clear cut as the plaintiffs

suggest. Youbet offered ADW services to Illinois residents before
Illinois required ADW providers to contract with Illinois race
tracks. (See Stip. Stmt. of Facts, attached as Tab 36 to Defs.'
Appx., ¶¶ 34, 37); cf. 230 ILCS 5/3.28. After Illinois imposed the
requirement, Youbet needed to enter into a contract with an
Illinois race track to continue providing ADW services in Illinois
(hence, the CBA). Its competitor, TwinSpires, had an agreement in
place with Arlington Park. (See Stip. Stmt. of Facts ¶ 92; see
also Defs.' Rule 56.1(a)(3)(C)Stmt. ¶ 43.) The race tracks that
would eventually execute the CBA approached Youbet as a group and
proposed a partnership that would benefit Youbet by permitting
Youbet to lock up the rest of the ADW market in Illinois. (See
Defs.' Rule 56.1(a)(3)(C) Stmt. ¶ 43.) This purpose is reflected
in the provision prohibiting the Associates from contracting with
any other ADW provider during the CBA's term. (See CBA § 4.1.) As
we mentioned earlier, Youbet initially paid Fairmount's share of
CBA fees into an escrow account for its benefit. The fact that
Hawthorne and Balmoral/Maywood ultimately split that money amongst
themselves tends to support the plaintiffs' view that the
Associates are entitled to the "remainder" of CBA fees after the
"Company Fees" are deducted, no matter how many Associates there
are. But without knowing more about the circumstances surrounding
this transaction, we cannot draw a reliable inference that the
parties understood that the Associates' claim to Fairmount's share

- 34 -

of CBA fees was superior to Youbet's. Moreover, the parties agree that Youbet ultimately stopped paying Fairmount's share. We understand this to mean that Youbet retained a greater portion of Net Commissions, Net Revenues, and breakage after Fairmount's departure, which is consistent with the defendants' interpretation of § 6.1 as applied to Hawthorne. The plaintiffs seem to argue that the P&L statements show otherwise, but the evidence that they cite does not clearly establish that point. (See Pls.' Mem. at 17-18.)[13] According to the defendants, their interpretation makes sense in the broader context of the agreement: Youbet should be compensated because it lost the benefits of exclusivity. The parties genuinely dispute the proper interpretation of their course of dealing, making summary judgment inappropriate.

In sum, we conclude that the proper interpretation of § 6.1 as applied to plaintiffs' claim for damages is a question for the jury.

### b. Partial Breach

The defendants argue that the plaintiffs' damages, if any, should be limited to the two-week period between the integration and the defendants' notice of termination under the partial-breach doctrine. After a party materially breaches a contract, the non-

---

[13] The cited portions of Michael Cody's deposition testimony merely refer to the P&L statements in a general way. (See Cody Dep., attached as Ex. G to Pls.' Designation, at 80, 83-85.) As for the P&L statements themselves, and the figures contained therein, the plaintiffs have made no attempt to explain how they support their position.

breaching party has a choice: either terminate the contract, or insist on continued performance and sue for damages caused by the breach. See Emerald Investments Ltd. Partnership v. Allmerica Financial Life Ins. and Annuity Co., 516 F.3d 612, 618 (7th Cir. 2008); see also 14 Williston on Contracts § 43:15 (4th ed.) ("[T]he general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.").[14]   If the non-breaching party elects not to terminate the contract, it must continue to abide by its terms. Emerald Investments, 516 F.3d at 618. Section 10.2(d) of the CBA provides that either party may terminate the agreement by providing written notice of a material breach that has not been cured within 30 days after notice thereof. (CBA § 10.2(d).) The plaintiffs did not provide written notice of a material breach in

---

[14]/   The plaintiffs cite the general rule that "a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party." Daniggelis v. Pivan, 513 N.E.2d 92, 96 (Ill. App. Ct. 1987); (see also Pls.' Reply at 12-13).  The plaintiffs have not cited, nor are we aware of, any Illinois case expressly reconciling the "first breach" rule with the partial-breach doctrine.  But the two doctrines appear compatible: the first breaching party cannot sue for a later breach unless the other party insists on continued performance.  See 14 Williston on Contracts § 43:15 (4th ed.) (recognizing the partial-breach doctrine as an exception to the general rule that a material breach discharges the non-breaching party's duty to perform). Moreover, a reasonable jury could conclude that the first material breach was Hannon's conversation with Laino on November 10, 2010 in which he accused the defendants of "a possible illegal business practice."  (See Defs.' Stmt. ¶ 70; see also infra (discussing the CBA's "best efforts" clause).)  This conversation occurred approximately a week before the defendants integrated the ADW platform.

the immediate wake of the integration. In addition, Hannon's email on November 10, 2010 — before the integration — could be construed to insist on continued performance. (See Defs.' Stmt. ¶ 51 (stating that he understood the terms of the integration and demanding a single change before it was implemented).) In that case, the plaintiffs were required to continue to uphold their end of the bargain despite the defendants' alleged breach. Among other duties, the CBA required the plaintiffs to "use their best efforts to secure and/or assist Youbet in securing any licenses required or available in Illinois with respect to this Agreement and/or www.youbetillinois.com . . . ." (See Second Am. to CBA ¶ 9.) Before and during the November 2010 IRB proceedings, the plaintiffs accused the defendants of anti-competitive practices and credit-card abuse, going so far as to say that the Justice Department should investigate the defendants' conduct. The plaintiffs insist that they did not breach the "best efforts" clause because they did not ask the IRB to deny Youbet's application, but instead asked it to impose "conditions" on Youbet. Neither party has cited any case law construing a comparable "best efforts" clause. But we think it would be absurd to construe the term "best efforts" to permit the plaintiffs to malign the defendants before the IRB so long as they did not formally object to Youbet's application. See, e.g., International Broth. of Elec. Workers, Local 21 v. Illinois Bell Telephone Co., 491 F.3d 685, 688 (7th Cir. 2007) ("When

interpreting a contract, we look first to the plain meaning of the provision, and strive to avoid absurd results.") (applying Illinois law). The plaintiffs clearly did not use their "best efforts" to assist Youbet in obtaining renewal of its ADW license.

However, we are not prepared to rule as a matter of law that the plaintiffs cannot recover damages after December 1, 2010. First, whether the plaintiffs elected to continue the contract is a disputed question of fact. Only two weeks separated the integration and Youbet's termination notice, which is relatively little time to establish a course-of-dealing consistent with an intent to continue the CBA. Also, as we discussed before, there is evidence from this time period that the plaintiffs were dissatisfied with the integration, despite the conciliatory tone of Hannon's email the week before. Second, the Executive Director's recommendation to deny Youbet's renewal application was expressly based upon the terms of the ADW-platform integration and his interpretation of Illinois racing law, and not on any alleged misconduct by the defendants. So, a reasonable jury could conclude that the plaintiffs' lobbying efforts were immaterial. Third, there is evidence in the record that Youbet applied to renew its license simply to fulfill obligations to the plaintiffs under the CBA. (See Defs.' Rule 56.1(a)(3)(C) Stmt. ¶ 25.) As we understand it, the IRB's decision to defer ruling on Youbet's renewal application did not affect the defendants' ability to receive

- 38 -

wagers from Illinois residents through the integrated platform because TwinSpires was separately licensed. A reasonable jury could conclude that the defendants seized on a nonmaterial breach of the agreement to terminate the CBA without having to pay the plaintiffs a break-up fee.

### CONCLUSION

The parties' cross-motions for summary judgment [88 and 100] are denied. The defendants' motion to strike [111] is denied. A status hearing is set for June 26, 2013 at 10:30 a.m. to set the case for trial.


DATE:     June 18, 2013

ENTER: _____

          John F. Grady, United States District Judge